**UNITED STATES**

v.

**Herschel L. FAGAN, 272 60 2506 Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 86 2470.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 20 Feb. 1986.

Decided 19 June 1987.

LCDR ROBERT J. SMITH, JAGC, USN, Appellate Defense Counsel.

LT S.A. KITTERMAN, Jr., JAGC, USNR, Appellate Defense Counsel.

LT GEORJAN D. OVERMAN, JAGC, USNR, Appellate Government Counsel.

Before GORMLEY, RILEY and GRANT, JJ.

GRANT, Judge:

The appellant was tried by general court-martial (enlisted members) and, contrary to his pleas, found guilty of one specification of burglary (Charge II and the Specification), one specification of housebreaking (Charge III and the Specification), and two

specifications of larceny (Charge I and the Specifications), in violation of Articles 129, 130, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 929, 930, and 921. He was sentenced to be confined for five years, to forfeit all pay and allowances, to be reduced to pay grade E–1, and to be discharged from the service with a bad-conduct discharge. The convening authority approved the sentence as adjudged. The appellant, on appeal, alleged three assignments of error, the last of which we summarily deny, as follows:

THE PHOTOGRAPHS OF APPELLANT'S FINGERTIPS AND THE FORENSIC PATHOLOGIST'S OPINIONS ABOUT THEM SHOULD HAVE BEEN SUPPRESSED BECAUSE THEY RESULTED FROM AN ILLEGAL APPREHENSION.

THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT BURGLARIZED ROOM 113, BUILDING 1656 (Charge I, Specification 1 and Charge III and the Specification).

APPELLANT'S GUILT AS TO SPECIFICATION 2 OF CHARGE I AND CHARGE III WAS NOT PROVEN BEYOND A REASONABLE DOUBT BECAUSE THERE WAS NO CHAIN OF CUSTODY FOR THE SOLE INCRIMINATING EVIDENCE AND THE EVIDENCE WAS NOT IDENTIFIED BY ITS OWNER.

I

A

The charges arose from wrongful entries which occurred at the enlisted barracks of 1st Battalion, 12th Marines, located at Marine Corps Air Station, Kaneohe Bay, Hawaii. Two of the entries involved room 201 of building 1655 and room 113 of building 1656 and resulted in the larceny of valuable property (a television, video cassette recorders, a telephone, and a camera, among other valuables) belonging to two of the occupants of those rooms, Corporal (CPL) S and Lance Corporal (LCPL) F, respectively. The circumstances of these two entries were similar in that they involved thefts of high value items from the victims' wall lockers, and they both occurred while the victims were away from their rooms taking part in battalion exercises at off-island training areas. During the period in which these entries occurred, the battalion had been in a heightened awareness about such matters and no one remembered seeing any strangers in or around the rooms. Concluding that the perpetrator of the offenses must have been someone from within the battalion and successfully having lifted latent fingerprints from the rooms during his investigation, the Naval Investigative Service (NIS) agent conducting the investigation, Special Agent S, sought and obtained permission from the Commanding Officer of 1st Battalion, 12th Marines, to fingerprint all Marines in the battalion who had not gone to the off-island training exercises at the time of the occurrence of the entries. Approximately 100 Marines fit this category. An officer within the battalion was assigned to assist the NIS investigative agent in obtaining fingerprints. The NIS investigator would contact the officer by telephone and request that he provide the agent with "15 or 20 members of the battalion at a given time and a given place" for fingerprinting. The officer maintained the master list of all those persons to be fingerprinted. The NIS agent did not specify whom he wanted to see. He merely asked for a given number of persons, and the procedures were coordinated in such a way "as to cause the battalion the least amount of inconvenience." On 29 March 1985 the appellant was ordered by his unit to report to NIS for fingerprinting and was told that he would not receive his paycheck until he did. Under protest, the appellant proceeded unaccompanied to NIS. By then, the other Marines had been fingerprinted.

At the outset, we assume without deciding that the actions of the commander in ordering the appellant to report to Naval Investigative Service (NIS) for fingerprinting constitute a seizure of his person within the protection of the Fourth Amendment, where the objective indicia surrounding the order reveal the appellant's freedom of movement was temporarily restrained,

against his will, solely for the purpose of law enforcement, the show of authority did not occur "within the context of the military and its daily operations," given the NIS involvement, and there was every indication manifested to the appellant that the limited restriction on his freedom of movement at NIS was necessary for investigative purposes. *United States v. Sanford,* 12 M.J. 170 (C.M.A.1981) (distinguishable on facts). *But see United States v. Hardison,* 17 M.J. 701 (NMCMR 1983). As such, we will direct our attention to the reasonableness of the commander's order, as "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

The reasonableness test requires balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). *See also United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving border patrol justified in briefly stopping moving vehicle near border for questioning of occupants only where there are articulable facts known to the officer making the stop, together with rational inferences therefrom, that reasonably warrant suspicion the vehicle contained illegal aliens, citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (border patrol at fixed checkpoint may briefly detain persons in motor vehicle for questioning in regard to transportation of illegal aliens without probable cause or reasonable suspicion. The court distinguished fixed checkpoint stops from roving border patrols because the "subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *Martinez-Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1128); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (grand jury may subpoe-

na persons to provide nontestimonial identification evidence in the nature of voice exemplars without probable cause or any reasonable grounds to connect persons subpoenaed with the crime. In holding that such seizures were reasonable and not protected by the Fourth Amendment, the Court quoted with approval excerpts from Judge Friendley's decision in *United States v. Doe,* 475 F.2d at 898 that

> [t]he latter is abrupt [referring to an arrest or investigative stop], is effected with force or the threat of it and often in demeaning circumstances, and, in the case of arrest, results in a record involving social stigma. A subpoena ... involves no stigma ...; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of a court.

*United States v. Dionisio,* 410 U.S. at 10, 93 S.Ct. at 770, 35 L.Ed.2d at 77); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (fingerprint exemplars taken at police station pursuant to dragnet operation without probable cause or warrant is violative of Fourth Amendment); *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (reaffirmed holding in *Davis,* but approved of procedure for police officer to detain briefly suspect in the field for purposes of fingerprinting "where there is only reasonable suspicion not amounting to probable cause." *Hayes v. Florida,* 470 U.S. at 816, 105 S.Ct. at 1647, 84 L.Ed.2d at 710. In both *Hayes* and *Davis,* the Court further suggested that "under circumscribed procedures, the Fourth Amendment might permit the judiciary to authorize the seizure of a person on less than probable cause." *Hayes v. Florida,* 470 U.S. at 817, 105 S.Ct. at 1647, 84 L.Ed.2d at 711; *Davis v. Mississippi,* 394 U.S. at 728, 89 S.Ct. at 1398, 22 L.Ed.2d at 681).

Before comparing the facts in the present case to the principles enunciated above, we make the following findings regarding the seizure of the appellant pursuant to the order of the commander, on 29

March 1985, to report to NIS for finger-printing:

1. The appellant was insulated from unilateral action by NIS where NIS requested and received permission from the appellant's commander to fingerprint the appellant.

2. The commander assigned an officer in his command to act as a liaison between the command and NIS.

3. The appellant was advised of the commander's order by a member of his command and was permitted to proceed unaccompanied, at a reasonable time, to NIS for fingerprinting, albeit against his will, along with some 100 other unit members subject to the same order.

4. Appellant was not suspected of wrongdoing at the time he reported to NIS, nor was he arrested or threatened with arrest in the event he did not comply with his commander's order, or put in fear for his personal security.

5. Neither the commander nor NIS, at the time, had probable cause or reasonable suspicion to conclude the appellant committed the wrongful entries and larcenies, but there were reasonable grounds to believe that one of the approximate 100 members of the unit remaining behind when the unit departed the island for training did commit the offenses, and further, that the finger-print exemplars of such persons would identify the perpetrator by virtue of latent fingerprints taken from the crime scene.

6. The commander had a substantial interest in identifying the perpetrator of the crimes because of the adverse impact upon morale and discipline attendant to wrongful entries and larcenies of personal property belonging to unit members deployed and unable to provide security for their personal possessions.

7. The intrusion upon the personal liberties and security of the appellant was minimal where the restraint of appellant's freedom was initially contemplated to be only brief in nature and solely for the purpose of obtaining the fingerprint exemplars.

A comparison of the present case and those cited above is pertinent. The appellant was not subjected to the station house dragnet operation condemned in *Hayes* and *Davis* without probable cause or warrant. He was not detained in the field by NIS contrary to the procedures prescribed in *Terry* and *Brignoni-Ponce* for brief detentions based upon reasonable suspicion. On the contrary, the appellant was insulated from a station house arrest or brief field detention by the presence of the commander. Most importantly, the appellant was not placed in fear in reporting to NIS, which in *Martinez-Fuerte* was an essential consideration in approving fixed checkpoint stops near the border without probable cause or reasonable suspicion. Granted, the commander's order, under the circumstances, was not the civilian equivalent of a grand jury *subpoena duces tecum* which in *Dionisio* was approved without even a reasonable nexus between the person subpoenaed and the offense committed. It was, however, more in the nature of the judicial authorization approved in *Hayes* and *Davis* for obtaining fingerprints on less than probable cause, although neither *Hayes* nor *Davis* offered any specific guidance on what such a standard might be or how it might be implemented.

We recognize that a commander serves a dual purpose being responsible for the unit mission and the morale and discipline required to carry out that mission as well as acting in a quasi-judicial capacity in certain military justice matters. Although the commander in his quasi-judicial capacity did not issue a warrant for the production of fingerprint exemplars, as envisioned in *Hayes* and *Davis*, we conclude that within the military context, his presence safeguarded the appellant from oppressive governmental action and his order thereby qualifies as the functional equivalent of the "circumscribed procedure" prescribed in *Hayes* and *Davis* which warrant the seizure of persons for fingerprinting on less than probable cause. As there is no civilian counterpart for the military commander, our interpretation of the Fourth Amendment recognizes that it must be construed within the "context of military society." *United States v. Schneider*, 14 M.J. 189

(C.M.A.1982). As such, we believe the presence of the commander initially negated the requirement for probable cause or reasonable suspicion, where the appellant was treated properly at NIS and without fear or stigma; the Government had a substantial interest in identifying the perpetrator of the crimes; the intrusion into the appellant's privacy and security was minimal; the commander insulated the appellant from unilateral NIS action; and there was a reasonable nexus between the evidence sought from the approximate 100 persons fingerprinted and the identification of the perpetrator of the crimes, although there was no probable cause or reasonable suspicion that any particular person committed the offenses. Under the circumstances, the order of the commander directing the appellant to report to NIS for fingerprinting was not an unreasonable seizure violative of the Fourth Amendment.

### B

Our inquiry, however, does not end here. *Dionisio* addressed not only the Fourth Amendment implications of initially seizing the person pursuant to a *subpoena duces tecum* for purposes of obtaining voice exemplars, but the Fourth Amendment implications of actually seizing the voice exemplar. *Dionisio* decided the latter issue on the basis that there is no reasonable expectation of privacy in one's voice given its constant exposure to the public, and therefore there is no Fourth Amendment consideration in taking the actual voice exemplar given the legality of the initial seizure of the person for such purpose. *Dionisio* cited *Davis* to the effect that fingerprinting itself "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search," and that in *Davis* the "initial seizure—the lawless dragnet detention ... violated the Fourth and Fourteenth Amendments, not the taking of the fingerprints." *United States v. Dionisio*, 410 U.S. at 11, 93 S.Ct. at 770, 35 L.Ed.2d at 77 and 80.

We discern no appreciable difference between the taking of voice and fingerprint exemplars. Different mechanical procedures are required to be sure, but the underlying principle of openness to the public is evident in both. Fingerprints are routinely left behind by persons in their daily affairs without consideration of the consequences. Furthermore, the taking of fingerprints involves neither repeated harassment nor any of the privacy and security considerations attendant to interrogations and searches. *Hayes v. Florida*, 470 U.S. at 814, 105 S.Ct. at 1646, 84 L.Ed.2d at 709. Finally, "fingerprinting is an inherently more reliable and effective crime solving mechanism than other types of evidence such as lineups and confessions." *Id.* As such, we conclude that had NIS initially taken the appellant's fingerprints during a brief stop at NIS, on 29 March, pursuant to the commander's order, the appellant would have had no reasonable expectation of privacy requiring Fourth Amendment safeguards beyond those present in the initial seizure of his person.

### C

Despite the efforts of NIS, fingerprint exemplars could not be taken from the appellant on 29 March, at least on the first attempt. NIS then visually examined his fingertip pads and found that all ten digits had been uniformly scraped. Expert testimony, during the merits, revealed the scrapes had been self-inflicted some 12 to 24 hours prior to the appellant reporting to NIS. A closer visual examination of the left ring finger further revealed distinct ridge characteristics of the fingerprint strikingly similar to those found on a latent fingerprint taken from the room of one of the victims, which characteristics were not present in the approximate 100 persons previously fingerprinted by NIS. NIS immediately advised the appellant of his Article 31, 10 U.S.C. § 831 *Miranda* rights, interrogated him, and later the same day fingerprinted and photographed his hands.

■ Although NIS did not conclude, on the facts known, that probable cause existed, we shall focus on the "objective factors rather than subjective intent" in our independent determination that such evidence did in fact constitute probable cause, justi-

fying not only the subsequent custodial interrogation of the appellant, but further warranting the subsequent fingerprinting and photographing of the appellant's hands as incidental to what in fact amounted to a custodial arrest by virtue of the appellant being in NIS custody for several hours before being released to his unit. *See Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The appellant understood he was not free to leave the presence of NIS until released later in the day, and the trial judge made specific findings of fact that the appellant was subjected to custodial interrogation.

Regarding the matter of probable cause, we make one final observation. NIS lawfully could have initially taken the appellant's fingerprints upon reporting to NIS, without probable cause or reasonable suspicion, as we indicated earlier in our decision. As such, NIS also could and did lawfully observe the scraped fingertip pads and visually examine the ridge characteristics of the left ring fingertip pad without probable cause or reasonable suspicion. Such evidence, visually observed, together with the latent fingerprints taken from the crime scene that matched only the appellant's fingerprints out of the approximate 100 persons examined, constitutes the factual predicate underlying our objective determination that probable cause existed prior to the custodial interrogation of the appellant and subsequent fingerprinting and photographing of his hands while in the custody of NIS for more than a brief period of time.

### D

As the appellant's fingerprints taken on 29 March were unreadable, NIS again approached the appellant this time at a military hospital, on 2 August 1985, where the appellant was subject to the direct authority of the hospital commander. Nevertheless, NIS kept the original commander apprised of the investigation although NIS did not request from the original commander permission to fingerprint the appellant. Upon reporting to the hospital, NIS checked in at the security desk and with Major Tribbey, the ward nurse who was in charge of the space where the appellant was assigned. He advised the ward nurse of his desire to fingerprint the appellant. Permission was granted. NIS then sought permission from the appellant, who refused. NIS requested Hospitalman First Class Morley, Navy-Marine Corps liaison officer, to order the appellant to submit to fingerprinting. Morley ordered the appellant as requested, but again the appellant refused. NIS elected not to pursue the matter further until the appellant was released from the hospital. The evidence reveals that NIS made it known to the appellant, either directly or indirectly, that he would be fingerprinted upon his release from the hospital even if it meant effecting his arrest. The appellant, upon being released from the hospital, elected to proceed to NIS, on 6 August 1985, for fingerprinting rather than chance the embarrassment of being arrested by NIS for refusing to provide fingerprints in the field. Appellant was fingerprinted on 6 August 1985 at NIS without incident, and his prints were linked to the latent prints taken from the crime scene. As a result, the appellant was interrogated on 1 October 1985 and made yet another statement.

The factual scenario at the hospital differed somewhat from that on 29 March, as neither the appellant's original commander nor the hospital commander specifically authorized the fingerprinting of the appellant. However, probable cause existed on 2 and 6 August that the appellant committed the offenses, which was a safeguard not present when the appellant was initially ordered to NIS on 29 March. Further, the brief stop intended at the hospital was under the control of the ward nurse, a representative of the hospital commander. We may infer from the record that the procedure for taking the fingerprints at the hospital was intended to be brief with the least amount of intrusion on the personal liberty and security of the appellant. Under the circumstances, we find this not unlike the procedure authorized in *Hayes* for obtaining fingerprints in the field during a brief stop, without a warrant, upon reasonable

suspicion, especially where the hospital staff insulated the appellant from any possible oppressive NIS conduct. The fact that appellant, under the threat of arrest, elected to proceed to NIS, on 6 August, to provide fingerprint exemplars does not take it outside the *Hayes* rationale, where the appellant's fingerprints could have been taken without incident at the hospital had the appellant so elected on 2 August. The appellant's decision to proceed to NIS was a matter of personal choice, and does not change the result envisioned by *Hayes* for the taking of fingerprint exemplars in the field upon reasonable suspicion.

Subject to the foregoing, neither *Hayes* nor our rationale would permit NIS, acting unilaterally in a dragnet operation, to remove forcibly a suspect from his home or other place to the "police station" without probable cause and authorization for fingerprinting. *See Hayes v. Florida,* 470 U.S. at 815, 105 S.Ct. at 1646, 84 L.Ed.2d at 710. We further conclude that *Hayes* would authorize the use of reasonable force during a brief field detention in the event a suspect is uncooperative for purpose of obtaining fingerprint exemplars upon reasonable suspicion. As NIS, on 2 and 6 August, had more than reasonable suspicion, it was proper to threaten the appellant with the forcible loss of freedom if he did not cooperate. The procedures instituted by NIS for obtaining the appellant's fingerprints, under the circumstances, did not constitute an unreasonable seizure violative of the Fourth Amendment, and the fingerprints taken on 6 August were lawfully seized as was the appellant on 1 October 1985 for further interrogation in light of the 6 August fingerprints linking him to the latent prints taken from the crime scene.[1]

## II

Appellant next claims that the Government's evidence of guilt in regard to Charge I, Specification 1, and the Specification under Charge III, allegedly consisting solely of a latent fingerprint which matched the appellant's and which was found on an inside window pane of the room broken into, was insufficient to prove his guilt beyond a reasonable doubt of the offenses as charged. Appellant maintains as well that it would have been impossible for him to commit the crimes given his location during the critical time period with Sergeant A and the short amount of time that he would have had to perpetrate the crime, and that his fingerprint was in the room because he had gone there after the discovery of the crime pursuant to Sergeant A's instructions and had closed the window while guarding the room.

■ We find ample evidence in the record of trial to support the findings of guilty. The appellant's attempted explanations of his presence with Sergeant A at the time the crimes occurred and of how he inadvertently left a print in the room when he closed the window after Sergeant A instructed him to guard it, were both contradicted by the testimony of Sergeant A as well as by the appellant's initial statement to NIS in which he claimed no knowledge of the entry and larceny and failed to mention being in the victim's room pursuant to Sergeant A's instruction. Additionally, a forensic pathologist testified, upon studying the pictures of appellant's injured fingers, that the injuries to the fingertips were too regular to be accidental and that

1. Under our disposition of the case, we need not consider appellate government counsel's alternate argument that the appellant's fingerprint exemplars were held on file at the Headquarter's level and thus the fingerprint exemplars seized by NIS, on 6 August 1985, were admissible under the inevitable discovery rule approved of in *United States v. Kozak,* 12 M.J. 389 (C.M.A. 1982) and later incorporated under Military Rule of Evidence 311(e)(1), as amended. The issue, however, would raise an interesting question regarding the effect of the inevitable discovery of substitute evidence on file, not the evidence actually seized, and would further entail an evaluation of the trial judge's findings regarding a controverted issue of fact, as the appellant hotly contested evidence that his fingerprint exemplars were on file, and the Government, at trial, failed to provide direct evidence of the existence of such fingerprint exemplars or any evidence that the Government was engaged in attempting to secure such evidence on 6 August 1985 when the appellant's fingerprint exemplars were seized by NIS.

they occurred only a very short time before the appellant was fingerprinted, thus demonstrating that the appellant purposely attempted to avoid being fingerprinted for fear of being identified as the perpetrator of the crimes. We are convinced beyond a reasonable doubt that the appellant had the opportunity and sufficient time to and did commit the offenses which are the subject of the assignment of error.

The findings of guilty and sentence as approved on review below are affirmed.

Chief Judge GORMLEY and Judge RILEY concur.