**UNITED STATES, Appellee,**

v.

**Herschel L. FAGAN, Lance Corporal, U.S. Marine Corps, Appellant.**

No. 59,679.

NMCM 86 2470.

U.S. Court of Military Appeals.

April 28, 1989.

For Appellant: *Lieutenant J.A. Toliver, JAGC, USNR* (argued).

For Appellee: *Lieutenant Scott A. Hagen, JAGC, USNR* (argued); *Captain Wendell A. Kjos, JAGC, USN* (on brief).

*Opinion of the Court*

COX, Judge:

The question in this case is whether appellant was "seized" in violation of the Fourth Amendment to the Constitution.[1] The facts of the case were well summarized by the Court of Military Review:

"The charges arose from wrongful entries which occured at the enlisted barracks of 1st Battalion, 12th Marines, located at Marine Corps Air Station, Kaneohe Bay, Hawaii. Two of the entries involved room 201 of building 1655

---

1. The Fourth Amendment to the Constitution of the United States provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

and room 113 of building 1656 and resulted in the larceny of valuable property (a television, video cassette recorders, a telephone, and a camera, among other valuables) belonging to two of the occupants of those rooms, Corporal (CPL) S and Lance Corporal (LCPL) F, respectively. The circumstances of these two entries were similar in that they involved thefts of high value items from the victims' wall lockers, and they both occurred while the victims were away from their rooms taking part in battalion exercises at off-island training areas. During the period in which these entries occurred, the battalion had been in a heightened awareness about such matters and no one remembered seeing any strangers in or around the rooms. Concluding that the perpetrator of the offenses must have been someone from within the battalion and successfully having lifted latent fingerprints from the rooms during his investigation, the Naval Investigative Service (NIS) agent conducting the investigation, Special Agent S, sought and obtained permission from the Commanding Officer of 1st Battalion, 12th Marines, to fingerprint all Marines in the battalion who had not gone to the off-island training exercises at the time of the occurrence of the entries. Approximately 100 Marines fit this category. An officer within the battalion was assigned to assist the NIS investigative agent in obtaining fingerprints. The NIS investigator would contact the officer by telephone and request that he provide the agent with '15 or 20 members of the battalion at a given time and a given place' for fingerprinting. The officer maintained the master list of all those persons to be fingerprinted. The NIS agent did not specify whom he wanted to see. He merely asked for a given number of persons, and the procedures were coordinated in such a way 'as to cause the battalion the least amount of inconvenience.' On 29 March 1985 the appellant was ordered by his unit to report to NIS for fingerprinting and was told that he would not receive his paycheck until he did. Under protest, the appellant proceeded unaccom-

panied to NIS. By then, the other Marines had been fingerprinted.

\* \* \*

Despite the efforts of NIS, fingerprinting exemplars could not be taken from the appellant on 29 March, at least on the first attempt. NIS then visually examined his fingertip pads and found that all ten digits had been uniformly scraped. Expert testimony, during the merits, revealed the scrapes had been self-inflicted some 12 to 24 hours prior to the appellant reporting to NIS. A closer visual examination of the left ring finger further revealed distinct ridge characteristics of the fingerprint strikingly similar to those found on a latent fingerprint taken from the room of one of the victims, which characteristics were not present in the approximate 100 persons previously fingerprinted by NIS. NIS immediately advised the appellant of his Article 31, 10 U.S.C. § 831 *Miranda* rights, interrogated him, and later the same day fingerprinted and photographed his hands.

"The appellant understood he was not free to leave the presence of NIS until released later in the day, and the trial judge made specific findings of fact that the appellant was subjected to custodial interrogation.

\* \* \*

"As the appellant's fingerprints taken on 29 March were unreadable, NIS again approached the appellant this time at a military hospital, on 2 August 1985, where the appellant was subject to the direct authority of the hospital commander. Nevertheless, NIS kept the original commander apprised of the investigation although NIS did not request from the original commander permission to fingerprint the appellant. Upon reporting to the hospital, NIS checked in at the security desk and with Major Tribbey, the ward nurse who was in charge of the space where the appellant was assigned. He advised the ward nurse of his desire to fingerprint the appellant. Permission was granted. NIS then sought permis-

sion from the appellant, who refused. NIS requested Hospitalman First Class Morley, Navy–Marine Corps liaison officer, to order the appellant to submit to fingerprinting. Morley ordered the appellant as requested, but again the appellant refused. NIS elected not to pursue the matter further until the appellant was released from the hospital. The evidence reveals that NIS made it known to the appellant, either directly or indirectly, that he would be fingerprinted upon his release from the hospital even if it meant effecting his arrest. The appellant, upon being released from the hospital, elected to proceed to NIS, on 6 August 1985, for fingerprinting rather than chance the embarrassment of being arrested by NIS for refusing to provide fingerprints in the field. Appellant was fingerprinted on 6 August 1985 at NIS without incident, and his prints were linked to the latent prints taken from the crime scene. As a result, the appellant was interrogated on 1 October 1985 and made yet another statement."

24 MJ 865, 866, 869, 870 (1987).

■ We start our analysis with several observations. First, we agree with the court below that from the point on March 29, 1985, when the NIS agents noticed that appellant had attempted to obliterate his fingerprints and that the residual ridges appeared to match prints taken from the scene of the offenses, there was probable cause to apprehend appellant and to secure his fingerprints with or without consent. Thus, our concern in this case is only with whether there was any impropriety in the process leading up to these initial observations.

■ Second, people ordinarily do not have enforceable expectations of privacy in their physical characteristics which are regularly on public display, such as facial appearance, voice and handwriting exemplars, and fingerprints. *Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973); *United States v. Mara*, 410 U.S. 19, 21, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973); *United States v. Dioni-*

*sio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973); *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Therefore, again, the only question here is whether it was proper for appellant to be placed in the position that the agents were able to examine his fingerprints. The leading cases in the civilian area are *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), and *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

Davis, "a 14–year–old youth who had occasionally worked for the victim as a yardboy," was one of 24 youths who were picked up and brought to the police station for questioning and fingerprinting. The rape victim's only "description of her assailant" was "that he was a Negro youth." 394 U.S. at 722, 89 S.Ct. at 1395. Over a period of several days, petitioner "was interrogated by the police on several occasions—sometimes in his home or in a car, other times at police headquarters.... Several times during this same period petitioner was exhibited to the victim in her hospital room.... for the purpose of sharpening the victim's description of her assailant by providing 'a gauge to go by on size and color.'" *Id.* at 722–23, 89 S.Ct. at 1395. Several days later, concededly without a warrant or probable cause for his arrest, the police drove petitioner to another city where they "confined him overnight in the" city jail. Without being afforded benefit of counsel, the youth was given "a lie detector test and signed a statement." He was then incarcerated in his home city, where he was refingerprinted. These prints, along with those of the other 23 youths, were sent to the Federal Bureau of Investigation in Washington, D.C., where they were analysed and compared with "prints taken from the window of the victim's house," through which the assailant had apparently entered. *Id.* at 723, 89 S.Ct. at 1395. The FBI's conclusion was that petitioner's prints matched those found at the scene of the crime, and the second set of prints taken from Davis were admitted in evidence.

The Supreme Court concluded that both sets of prints taken from petitioner constituted unreasonable seizures of his person in violation of the Fourth Amendment. Otherwise,

[i]nvestigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "investigatory detentions."

*Id.* at 726–27, 89 S.Ct. at 1397.

Still, the Court allowed that it was arguable ... that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense.

*Id.* at 727, 89 S.Ct. at 1397–98 (citation omitted). This possibility was predicated on the "much less serious intrusion upon personal security than other types of police searches and detentions"; the fact that "fingerprint detention [would not] be employed repeatedly to harass any individual since the police need only one set of each person's prints"; the fact that "fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the 'third degree' "; and the fact that "there is no danger of destruction of fingerprints, ... [so that] the limited detention need not come unexpectedly or at an inconvenient time." *Id.* at 727, 89 S.Ct. at 1398. These same factors, however, militate against "exception[s]" to "the general requirement that the authorization of a judicial officer be obtained in advance of detention." *Id.* at 728, 89 S.Ct. at 1298.

In *Hayes,* law enforcement officers went to pick up petitioner at his house for the purpose of bringing him to the station for fingerprinting. There was "little specific information to tie petitioner ... to the crime." When Hayes declined to go voluntarily, "one of the investigators explained that they would therefore arrest him." 470 U.S. at 812, 105 S.Ct. at 1645. Given the alternatives, he complied. The trial court admitted the prints, which matched prints left at the scene of the crime by the perpetrator, "analogizing to the stop-and-frisk rule of *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 899] (1968)." *Id.* at 813, 105 S.Ct. at 1645.

The Supreme Court reversed, holding that *Davis v. Mississippi, supra,* governed. In the Court's view,

the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Id.* 470 U.S. at 816, 105 S.Ct. at 1647 (footnote omitted).

The Court did not, however, exclude the possibility that "a brief detention in the field for the purpose of fingerprinting" might be permissible under the Fourth Amendment, even "where there is only reasonable suspicion not amounting to probable cause." *Id.* at 816, 105 S.Ct. at 1647. Further, the Court did "not abandon the suggestion ... that under circumscribed procedures, the Fourth Amendment might permit the judiciary to authorize the seizure of a person on less than probable cause and his removal to the police station for the purpose of fingerprinting." *Id.* at 817, 105 S.Ct. at 1647.[2]

---

**2.** For an insightful analysis of *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), and *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), as they apply

In their scholarly opinion, authored by Judge Grant, the Court of Military Review surveyed the Fourth Amendment cases discussing reasonableness of searches and seizures involving fingerprints. Their findings and reasoning are cogent and bear repeating:

> In both *Hayes* and *Davis*, the Court further suggested that "under circumscribed procedures, the Fourth Amendment might permit the judiciary to authorize the seizure of a person on less than probable cause."

Before comparing the facts in the present case to the principles enunciated above, we make the following findings regarding the seizure of the appellant pursuant to the order of the commander, on 29 March 1985, to report to NIS for fingerprinting:

1. The appellant was insulated from unilateral action by NIS where NIS requested and received permission from the appellant's commander to fingerprint the appellant.

2. The commander assigned an officer in his command to act as a liaison between the command and NIS.

3. The appellant was advised of the commander's order by a member of his command and was permitted to proceed unaccompanied, at a reasonable time, to NIS for fingerprinting, albeit against his will, along with some 100 other unit members subject to the same order.

4. Appellant was not suspected of wrongdoing at the time he reported to NIS, nor was he arrested or threatened with arrest in the event he did not comply with his commander's order, or put in fear for his personal security.

5. Neither the commander nor NIS, at the time, had probable cause or reasonable suspicion to conclude the appellant committed the wrongful entries and larcenies, but there were reasonable grounds to believe that one of the approximate 100 members of the unit remaining behind when the unit departed the island for training did commit the offenses, and further, that the fingerprint exemplars of such persons would identify the perpetrator by virtue of latent fingerprints taken from the crime scene.

6. The commander had a substantial interest in identifying the perpetrator of the crimes because of the adverse impact upon morale and discipline attendant to wrongful entries and larcenies of personal property belonging to unit members deployed and unable to provide security for their personal possessions.

7. The intrusion upon the personal liberties and security of the appellant was minimal where the restraint of appellant's freedom was initially contemplated to be only brief in nature and solely for the purpose of obtaining the fingerprint exemplars.

24 MJ at 867–68 (citations omitted).

These findings led the Court of Military Review to conclude, *inter alia*, that

> [t]he appellant was not subjected to the station house dragnet operation condemned in *Hayes* and *Davis* without probable cause or warrant. He was not detained in the field by NIS contrary to the procedures prescribed in *Terry* and [*United States v.] Brignoni-Ponce[*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975),] for brief detentions based upon reasonable suspicion. On the contrary, the appellant was insulated from a station house arrest or brief field detention by the presence of the commander. Most importantly, the appellant was not placed in fear in reporting to NIS, which in [*United States v.] Martinez-Fuerte[*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976),] was an essential consideration in approving fixed checkpoint stops near the border without probable cause or reasonable suspicion. Granted, the commander's order, under the circumstances, was not the civilian equivalent

to these facts, *see* Schlueter, *Investigative Detentions for Purposes of Fingerprinting*, The Army Lawyer 10 (Oct.1988).

of a grand jury *subpoena duces tecum* which in *Dionisio* was approved without even a reasonable nexus between the person subpoenaed and the offense committed. It was, however, more in the nature of the judicial authorization approved in *Hayes* and *Davis* for obtaining fingerprints on less than probable cause, although neither *Hayes* nor *Davis* offered any specific guidance on what such a standard might be or how it might be implemented.

24 MJ at 868.

Further, in the Court's view,

within the military context, . . . [the commander's] presence safeguarded the appellant from oppressive governmental action and his order thereby qualifies as the functional equivalent of the "circumscribed procedure" prescribed in *Hayes* and *Davis* which warrant the seizure of persons for fingerprinting on less than probable cause.

*Id.* While this latter possibility is intriguing, we need not resolve it to decide this case.

■ The question "whether a person has been 'seized' within the meaning of the Fourth Amendment" is said to turn on whether, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave' " police custody. *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct.1975, 1979, 100 L.Ed.2d 565 (1988). Of course in the military, servicemembers rarely enjoy total freedom of movement. Rather, their place of duty and comings and goings are routinely determined by superiors, with the full backing of criminal sanctions. *E.g.*, Arts. 85, 86, 87, 90, and 92, Uniform Code of Military Justice, 10 USC §§ 885, 886, 887, 890, and 892, respectively. By donning the uniform, the servicemember knowingly accepts restrictions on liberty and privacy—in the name of mili-

tary necessity, effectiveness, and discipline—that his civilian counterpart would never tolerate. *See Unger v. Ziemniak*, 27 MJ 349 (CMA 1989); *Murray v. Haldeman*, 16 MJ 74 (CMA 1983); *United States v. Middleton*, 10 MJ 123 (CMA 1981). Thus to incorporate civilian standards of freedom of movement wholesale into the military setting would be unrealistic.

In addition to this military context, the nondisruptive, nonhumiliating, and nonintrusive manner in which these prints were initially sought separates this command action from those seizures described in *Davis* and *Hayes*. Appellant was not wrenched from his home or job and was not subjected to public or even private embarrassment. The prints were sought at reasonable times and in a reasonable manner. Appellant's place of duty temporarily became the NIS office during the brief interval necessary to accomplish the procedure. As a result of this brief reassignment, the flow of his pay and entitlements was not interrupted; his employment rights were not affected; the peace and security of his personal and family life were not disturbed; and the sanctity of his abode was left inviolate.

■ It scarcely needs mentioning that the armed forces have an overriding obligation to maintain complete and accurate identifying data regarding their servicemembers. The need to identify combat casualties and aircraft-disaster victims for the purpose of notifying next of kin and assisting dependents is self-evident. Even if there was no preexisting fingerprint information maintained on appellant by the Marine Corps,[3] he could have been required to supply such information at any time. A servicemember simply has no basis to withhold fingerprints from military authorities, provided that the manner of collecting them is reasonable. *Cf. Murray v. Haldeman, supra.*

3. Appellant denied that he had ever been previously fingerprinted in the military; the prosecution did not produce direct evidence of the preexistence of such prints or records; and the judge made no specific finding of their actual existence. However, the regulatory require-

ment that such records be maintained was established, and there was evidence that all servicemembers are routinely fingerprinted upon entry into the armed forces for the dual purposes of identification and criminal record searches.

■ Under the circumstances of this case, we hold that the commander's order to appellant and his fellow Marines to proceed to the Naval Investigative Service office for the purpose of being fingerprinted was reasonable and lawful, and it did not occasion an unlawful seizure within the meaning of the Fourth Amendment.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

SULLIVAN, Judge (concurring in the result):

I join my Brothers in affirming appellant's conviction but do so on the basis of the inevitable discovery rule. *See United States v. Roa*, 24 MJ 297, 303–04 (CMA 1987) (Sullivan, J., concurring in the result). *See generally Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Nix v. Williams*, 467 U.S. 431, 440–50, 104 S.Ct. 2501, 2507–12, 81 L.Ed.2d 377 (1984).