**UNITED STATES, Appellant,**

v.

**Raymond F. PHILLIPS, Sergeant, U.S. Army, Appellee.**

Misc. No. 89–31.
ACMR Misc. No. 8901862.

U.S. Court of Military Appeals.

March 27, 1990.

For the Accused: *Captain Cynthia G. Wright* (argued); *Colonel Robert B. Kirby, Lieutenant Colonel Russell S. Estey, Captain Keith W. Sickendick* (on brief).

For the United States: *Captain John J. Hogan* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Kathryn F. Forrester* (on brief); *Captain Martin D. Carpenter.*

*Opinion of the Court*

EVERETT, Chief Judge:

On May 8, 1989, a general court-martial was convened at Camp Casey, Korea, to try Sergeant Phillips for three alleged violations of United States Forces Korea (USFK) Regulation 27–5, which concerns the purchasing and disposition of duty-free items. *See* Art. 92, Uniform Code of Military Justice, 10 USC § 892. Initially the military judge considered a defense motion to suppress two documents taken from Phillips and his inculpatory pretrial statement. In accord with the defense contentions, the judge suppressed the evidence because he found that the documents had been "seized" in violation of the Fourth Amendment and that the other government evidence was "fruit" of that illegal seizure.

Pursuant to Article 62 of the Code, 10 USC § 862, the Government then filed an appeal with the Army Court of Military Review, which in a memorandum opinion

declined, however, to overturn the military judge's ruling. Thereafter, the Government filed a certificate of review with our Court. *See* Art. 67(b)(2), UCMJ, 10 USC § 867(b)(2). The certificate poses this question:

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW BY DENYING THE GOVERNMENT's APPEAL FROM THE MILITARY JUDGE'S RULING THAT APPELLEE WAS SEIZED WITHIN THE MEANING OF THE FOURTH AMENDMENT TO THE CONSTITUTION.

## I

The sole witness on the motion to suppress was Military Police Investigator Shawn S. Forehand, who testified for the Government. Forehand had been assigned to the Yongsan Criminal Investigation Command (CID) office for about 15 months and "work[ed] on the Blackmarket Team." As a result of training he had received from his Team Chief, he was "familiar with the various documents used in blackmarketing"—such as "ID cards, RCP [Ration Control Plate] cards, LOA [Letters of Authorization] cards, and anvil cards"—and could "readily recognize false or altered documents." His office had "formulated a profile of high blackmarket items" and had determined that "[a]ny television set over 25 inches is an extremely high blackmarket item."

During "the December–January timeframe," the Yongsan PX warehouse had received 25 television sets with a 36–inch screen and a price of "approximately $1,200.00." All but one of these sets were sold "within a 48–hour time period and that one probably sold the very next day." MPI Forehand had later determined that 18 of those purchases—approximately 75 percent—"were made with counterfeit documents."

To stem the tide of blackmarketing, the Yongsan CID office would

routinely do ID and RCP checks of anyone picking up a high blackmarket value item ... such as TVs or music systems ... and we do operations where we would target TVs themselves, just nothing but TVs, and we would stay there all day and check every TV going out. One day, we would do every TV, period, and the other day, we'd do every 36–inch TV or every 25–inch TV.

If he "saw a television" set being purchased "that fell in that high blackmarket item range," Forehand "would first identify [him]self and ask to see the identification and RCP card to verify that the individual was indeed authorized high dollar value privileges, through a routine ID and RCP check."

On January 16, 1989, Forehand was called to the Post Exchange (PX) warehouse at Yongsan to investigate a recent purchase of a 36–inch television. This warehouse was "on the other side of post," about a mile and a half from the PX. When Forehand arrived, Sergeant Phillips "was standing by a taxi and they were bringing his TV out of the warehouse." This was a 27–inch set, which had already been purchased by Phillips at the PX.

Forehand left the warehouse about 2 minutes later, after concluding his investigation of the other television set; and at that point, Phillips had already loaded his set in the trunk of the taxi, had just opened the taxi door to get in, and was about to leave. Both Forehand and Phillips were wearing civilian clothes at the time. Forehand showed Phillips his "MPI credentials and told him that" he "was with the blackmarket team." At Forehand's request,[1] Phillips surrendered "his ID card and his RCP." MPI Forehand asked Phillips what his unit was; and he replied "that it was A Company, 275th, at Camp Humphreys." Forehand asked the phone number of the unit; and Phillips "gave [him] a telephone

---

**1.** Forehand testified that he had "requested" Phillips' identification card. However, after hearing the full testimony and after argument

of counsel, the military judge found as a matter of fact that Forehand had "demanded" the card. *See* Appendix, *supra.*

number, which" he "attempted to call, but there was [sic] negative results." Forehand "then called the operator," who "said that there was no 275th Signal Company at Camp Humphreys, that it was indeed in Yongsan." Meanwhile, in reviewing Phillips' "temporary RCP," Forehand observed an irregularity.

Because of his suspicion concerning the genuineness of Phillips' documents, MPI Forehand "apprehended" him. On the way to the CID office, Phillips "made a spontaneous statement, stating that the items that he had purchased that day were not for him but were for a Korean national and, at that point," Forehand "stopped him and stated that he should not say anything else until he was advised of his rights."

On cross-examination, MPI Forehand conceded that the 27–inch television set which Phillips had purchased "was not the size television set that" he "had gone" to the warehouse "to investigate." Since Phillips was present on a military installation in civilian clothes, Forehand realized that "he would have previously had to show someone his military identification card to gain access to that installation." Moreover, since Phillips "had already purchased [a] television set, . . . he had already had to show someone an ID card and an RCP card." With respect to the sale of the 36–inch television set that Forehand had gone "to investigate," he was acquainted with "the individual picking up the TV" and "didn't have to check" the transaction in detail.

Since the warehouse was "located some distance from any living quarters of officers or enlisted soldiers, . . . it would be a normal occurrence for someone to have a taxicab take them and the television set that they had purchased to wherever they were living." MPI Forehand had "asked Sergeant Phillips to step outside of the car"; and if he had refused, the investigator most likely "would not have let him leave in that taxicab."

According to Forehand, Phillips "was not free to leave until he complied with" his request for "his ID card and his RCP

card." Forehand "had no reasonable suspicion that" Phillips "was involved in blackmarketing, prior to [his] examination of the ID card and RCP card"; and Sergeant Phillips was doing "nothing" that would not have been done by "an ordinary, honest soldier, who had legitimately purchased a television set." Phillips was "stopped" because he "had purchased . . . a television that . . . has been identified by us as being a high blackmarket item." If "the taxicab had [already] begun to move," Phillips might "have stopped him at the gate to check it."

In response to questions from the military judge, MPI Forehand explained that his office had "formed . . . a 'profile' of items" which were popular in the blackmarket; and large screen television sets were "a high blackmarketable item, highly wanted and highly purchased with counterfeit documents." On the other hand, the blackmarket team did not "profile potential purchases based on military rank or anything else."

If the taxi had been moving, Forehand might "have stopped him at the gate to verify his cards or I may have followed the taxi to verify that it actually wasn't transferred. Sometimes we do operations where we do that; instead of checking it right at the warehouse, we have Korean Customs or, sometimes, we just follow the taxis to see if it's being transferred." The blackmarket team office consisted at the time of "[a] Team Chief and approximately four other investigators." The "routine RCP and ID card check . . . was a mode of enforcement" decided upon by the Team Chief.

On the basis of the testimony by MPI Forehand, the military judge entered detailed findings of fact (*see* Appendix). Of greatest significance are these:

That after checking on the 36" color TV the Agent exited the warehouse and approached the accused. That at this point the *accused had entered the taxi and was in the process of departing.* At this point, the Agent stopped the accused, presented his credentials, and *demanded*

the accused provide him with his ID card and ration control documents. As recited by the Agent, at this time the accused was not free to leave until he complied with the Agent's demand and, indeed, *was required to exit the taxi.* That the purpose of this detention of the accused by the Agent was, as testified to by the Agent, to make sure the accused had authority to purchase such items as the TV.

(Emphasis added.) On the basis of his findings, the judge concluded that there had been "a seizure of" Sergeant Phillips "that had to be justified under the Fourth Amendment" and that no adequate justification had been provided.

## II

According to the Government, Forehand's encounter with the accused on the day in question amounted to nothing more than a "routine ... minimally intrusive" stop of the accused in order to check his identification and purchase authorization. Hence, the heart of the certified question presented in this case is whether the accused's Fourth Amendment rights were violated when Forehand accosted Phillips and asked him to step out of the taxi, produce his identification and ration control cards, and disclose his unit's telephone number. To answer this question, we must determine (1) whether the initial encounter between Forehand and Phillips involved a "seizure" of the accused within the meaning of the Fourth Amendment; and (2) if so, whether at the time of this "seizure," Forehand had a reasonable suspicion that Phillips was engaged in criminal activity.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court considered the circumstances under which there would be a sufficient restraint of a citizen's liberty to constitute a seizure within the meaning of the Fourth Amendment. Its conclusion was "that a 'seizure' has occurred" if "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16.

Pursuant to this test, a "stop and frisk" by a police officer is a seizure—although *Terry* also holds that this seizure is constitutionally permissible if the officer has a reasonable, articulable suspicion to justify the detention. *Id.* at 21, 88 S.Ct. at 1879.

Twelve years later, in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a majority of the Supreme Court held that drugs seized from the defendant by Drug Enforcement Administration (DEA) agents at the Detroit airport were admissible at trial, because her Fourth Amendment rights had not been violated. Two Justices—Stewart and Rehnquist—concluded that the defendant had not been seized within the meaning of the Fourth Amendment when the DEA agents accosted her in the airport concourse, "requested" her identification and airline ticket, and asked "her a few questions" about her travels. *Id.* at 555, 100 S.Ct. at 1877. Justice Stewart articulated the test for a "seizure" in this way:

[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*Id.* at 554, 100 S.Ct. at 1877 (footnote omitted). He and then-Justice Rehnquist were of the view that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way." *Id.* at 555, 100 S.Ct. at 1878, 64 L.Ed.2d at 510.

The other three Justices who concurred in the result—Blackmun, Burger, and Powell—declined to reach the "seizure" question, because it had not been considered by either of the courts below. They concluded that, even if the stop constituted a "seizure," it did not violate the Fourth Amendment, because the DEA "agents had reasonable suspicion that the" defendant "was engaging in criminal activity." *Id.* at 560, 100 S.Ct. at 1880. On the other hand, Justices White, Brennan, Marshall, and Stevens did not believe that "the Government

should be permitted to raise the 'seizure' question" for the first time in the Supreme Court and that, even if the question could be raised, "the proper course would be to direct a remand to the District Court for an evidentiary hearing." *Id.* at 571, 100 S.Ct. at 1885–86, 64 L.Ed.2d at 520.

In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the defendant had several characteristics of the "drug courier profile." *Id.* at 493, 103 S.Ct. at 1322. After initially asking Royer for his airline ticket and his driver's license and questioning him in an airport concourse, two detectives asked that he accompany them to a small room adjacent to the concourse. The detectives kept Royer's driver's license and airline ticket; and, without obtaining his permission, they "retrieved" his "luggage from the airline and brought it to the room where" Royer opened one of his suit cases, and an officer forced the other one open. *Id.* at 494–95, 103 S.Ct. at 1322–23. At no time did the detectives indicate to Royer that he was free to go.

Justice White, writing for a plurality of the Court, rejected as "untenable" the state's claim "that the entire encounter was consensual and hence Royer was not being held against his will at all." *Id.* at 501, 103 S.Ct. at 1326. He reasoned:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. at 554,

100 S.Ct. at 1877 (opinion of Stewart, J.) (footnote omitted).

460 U.S. at 501–02, 103 S.Ct. at 1326.

Justice Brennan, who concurred in the result, concluded that "plainly Royer was 'seized' for purposes of the Fourth Amendment when the officers asked him to produce his driver's license and airline ticket." *Id.* at 511, 103 S.Ct. at 1331. Justice Blackmun, dissenting, did not quarrel with "the plurality's adoption of the Fourth Amendment 'seizure' standard proposed by Justice Stewart in *Mendenhall*" or with its "conclusion that at some point in this encounter," Royer had been seized. *Id.* at 514, 103 S.Ct. at 1333. The other three dissenters "part[ed] company with the plurality's opinion ... in the assessment of the reasonableness of the officers' conduct following their initial conversation with Royer." *Id.* at 526 103 S.Ct. at 1340.

More recently, in *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct.1975, 100 L.Ed.2d 565 (1988), several police officers were approaching a street corner in a marked police car when the defendant, who was standing at the corner, turned and began to run. The police followed him around the corner in their car, briefly accelerated to catch up with him, and then drove alongside him for a short distance. Having observed Chesternut discard a number of packets from one of his pockets while the police car was alongside him, a police officer alighted from the car to examine the packets and found pills in them. Suspecting that the pills contained a controlled substance, the police arrested Chesternut. A later search of defendant at the station house turned up more illegal drugs.

Chesternut argued that "all police 'chases' are Fourth Amendment seizures." However, the Supreme Court observed that, since the decision in *Mendenhall*, it had "embraced" the test enunciated there by Justice Stewart—namely, whether "in view of all of the circumstances ..., a reasonable person would have believed that he was not free to leave." The Court explained that the circumstances which will prompt a person to conclude that he is not

free to leave "will vary, not only with the particular police conduct" involved "but also with the setting in which the conduct occurs." 108 S.Ct. at 1979.

In *Chesternut,* "[t]he record" did not indicate that the police had used their "siren or flashers; or that they commanded" Chesternut "to halt, or displayed any weapons; or that they" had driven the police "car in an aggressive manner to block" Chesternut's "course or otherwise control the direction or speed of his movement." *Id.* at 1980. Therefore, the Court concluded that, "[w]ithout more, the police conduct here—a brief acceleration to catch up with" Chesternut, "followed by a short drive alongside him—was not 'so intimidating' that" he "could reasonably have believed that he was not free to disregard the police presence and go about his business." *Id.* at 1981. Accordingly, there had been no "seizure" of the defendant. *Id.* at 1980.

In *United States v. Fagan,* 28 MJ 64 (CMA), *cert. denied,* — U.S. —, 110 S.Ct. 83, 107 L.Ed.2d 48 (1989), we acknowledged the seizure test enunciated by the Supreme Court in *Michigan v. Chesternut, supra.* 28 MJ at 69. However, we also indicated that, in considering the totality of the circumstances, there must be a recognition of conditions in military society. For instance, it is quite customary that a commander or a sergeant will direct a subordinate to come to his office, and, in the military context, this does not necessarily indicate that a "seizure" has occurred. With this caution in mind, we consider the evidence before the military judge when he determined that a "seizure" had occurred.

According to the undisputed evidence, MPI Forehand had identified himself as a law-enforcement agent; displayed his credentials; and stopped the taxi from driving away with Phillips as its passenger. He had asked Phillips to get out of the cab and had "demanded" the accused's identifica-

tion card and ration-control card. Forehand admitted that he would not have allowed Phillips to get back in the cab and proceed on his way, without first complying with the investigator's request to produce the two documents. Although "the subjective intention of" a police officer is relevant in assessing the Fourth Amendment implications of his conduct only to the extent that this intent had been communicated to the other person, *see United States v. Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d at 509 n. 6; *Michigan v. Chesternut,* 108 S.Ct. at 1980 n. 7, we believe that the military judge, who observed Forehand's demeanor, could readily have inferred that this intent was communicated to Phillips.

■ In *Florida v. Royer, supra,* the plurality opinion emphasizes that the police officers had the defendant's ticket, identification card, and luggage and that he "was never informed that he was free to board his plane if he so chose." These circumstances were among those which led the plurality to conclude that, "[a]s a practical matter, Royer was under arrest." *Id.* at 503, 103 S.Ct. at 1327. Likewise, in this case, the failure to return the accused's identification card—which would be indispensable for an American servicemember to move on and off a military installation in Korea—and the failure to inform Phillips that he could leave help support the military judge's finding that a "seizure" had occurred.[2]

■ Even though the accused was "seized," his Fourth Amendment rights would not be violated if, when he approached Phillips, MPI Forehand had "a reasonable suspicion supported by articulable facts that criminal activity" might have been going on. *United States v. Sokolow,* 490 U.S. —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio, supra.*

2. There is some indication in the record that Forehand would not have let Phillips depart until he had made telephone contact with the accused's unit in order to verify that he had been given accurate information. However, Forehand's testimony is not entirely clear

whether he attempted to reach the accused's unit by telephone before or after he examined the documents and noted the discrepancies thereon. Also, there is no evidence as to how long this process of verifying the telephone number lasted.

Moreover, even if the suspicion were based on facts which conformed to a "profile," it could still be reasonable. *United States v. Sokolow, supra* at 1587.[3]

In deciding whether MPI Forehand had "a reasonable suspicion" for "seizing" Phillips, our task is simplified by his concession in his sworn testimony that he did not possess any "reasonable suspicion" for seizing Phillips. Phillips had not acted suspiciously in any way; and his use of the taxi cab to transport the television set from the warehouse was entirely reasonable and customary on that military installation in Korea.

During oral argument, the question was also raised whether, even if there was no reasonable suspicion to justify the "seizure" of Phillips, it might nonetheless be reasonable for Fourth Amendment purposes.[4] Perhaps an exception should be made to the usual requirements for a lawful "seizure" when a person's identification is being checked in order to assure whether he is an enemy and is not entitled to be on a military installation. However, that was not the situation here, for MPI Forehand was not seeking to determine from the accused's identification card whether he was an American servicemember and authorized to be on the post.

Instead, the investigator was checking the identification card and the ration-control card as a means to determine whether the servicemember was engaged in blackmarketing. Moreover, as appellate defense counsel pointed out during oral argument, Phillips had already come on the post and had already purchased the television set—which meant that at least twice he had displayed his military identification card to military officials and at least once had shown them his ration-control card.

Forehand testified that his blackmarket team had a "policy" of checking all color television sets that had screens of 25 inches or larger and that on a particular day all such sets might be checked or only 36-inch or 27-inch sets might be checked. Assuming *arguendo* the validity of this "policy"—which emanated from the blackmarket team, rather than from any higher echelon—the "seizure" of Phillips fell outside that policy. On January 16, 1989, the implementation of the policy concerned only 36-inch television sets; and Forehand admitted that the only reason he was at the warehouse that day was because he had been called to inquire about a 36-inch television set which was to be delivered to the purchaser. Thus, for Forehand to check Phillips because he had purchased a 27-inch set was not even within the "policy" of the blackmarket team, as it was being implemented that day.

The testimony of MPI Forehand, which was the only evidence before the military judge, probably did not compel the judge's actual findings. However, that evidence adequately supports those findings, which, therefore, are binding upon the Court of Military Review and upon this Court in considering the Government's appeal under Article 62 of the Code. *Cf. United States v. Burris*, 21 MJ 140 (CMA 1985). Accordingly, the certified question must answered in the negative.

## III

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN concurs.

## APPENDIX

Special Findings: (*United States v. Phillips*)

That pursuant to the Status of Forces Agreement between the U.S. and Republic of Korea (SOFA), U.S. forces are permitted

---

3. In *Sokolow*, the "profile" was of a person, while here it was of a purchase. We do not think this distinction is significant, since the basic issue is whether the underlying facts—regardless of any "profile"—gave rise to reasonable suspicion.

4. This question goes far beyond the certified issue, which inquired only as to whether a "seizure" had occurred and not whether it was reasonable.

to import, duty free, certain items for use by members of the force and their dependents.

That consequently these items may be purchased in Post Exchanges at prices far below their prices on the Korean market and thus are frequently subject to blackmarket activity.

That pursuant to its obligations under the SOFA, HQ, United States Forces Korea has published rules relating to purchasing and disposition of such tax free items as well as ration control documents in relation to tax free items, by means of USFK Regulation 27–5.

That prior to 16 January 1989 the Blackmarket Team of the CID stationed at Yongsan, Korea had developed a "profile" of tax free items that were particularly subject to blackmarket which included VCR, music systems, color TVs and especially color TVs in sizes above 25".

That as a result of this "profile" the Chief of the Blackmarket Team developed a policy that his team would conduct checks on all color TVs purchased where the TV size exceeded 25". That this "policy" was not initiated nor directed by any command structure in Korea.

That on 16 January 1989 Investigator Forehand (Agent) arrived at the PX warehouse on Yongson to check on the recent purchase of a size 36" color TV. That this warehouse is some distance from the PX itself where a potential purchaser must arrange for the purchase of any TV and must present the necessary ration control documents to a sales person in order to complete the purchase.

That at the warehouse the Agent observed the accused in civilian clothing in the process of loading a 27" color TV into the trunk of a taxi.

That after checking on the 36" color TV the Agent exited the warehouse and approached the accused. That at this point the accused had entered the taxi and was in the process of departing. At this point the Agent stopped the accused, presented his credentials, and demanded the accused provide him with his ID card and ration control documents. As recited by the Agent, at this time the accused was not free to leave until he complied with the Agent's demand and, indeed, was required to exit the taxi. That the purpose of this detention of the accused by the Agent was, as testified to by the Agent, to make sure the accused had authority to purchase such items as the TV.

That, as to the 36" color TV which the Agent had initially gone to the warehouse to "check" on, once ascertaining the name of the purchaser, whom he "knew," the Agent did not thereafter, at any time, verify that the 36" color TV had indeed been properly purchased in accordance with regulations governing such tax free, high priced, items. A fact worthy of note since, as the Agent testified, he was aware the purchaser was a GS4 and would have required a Letter of Authorization to purchase that type of TV.

That clearly under these facts the accused was detained by a show of authority and under the circumstances the accused's liberty was effectively restrained. Indeed, as testified to by the Agent, the accused was not free to leave. Hence there was a seizure of this accused that had to be justified under the Fourth Amendment.

That equally clearly under the facts of this case there existed no reasonable grounds to suspect that the accused was in any way involved in criminal activity. To the contrary, given the fact the accused would have been required to provide the necessary documentation in order to have purchased the TV in the first instance, the only fact worthy of suspicion would have been the fact a taxi was being used to transport the TV.

That under the circumstances the accused's behavior was totally consistent with innocent conduct and was therefore insufficient for the Agent to conclude the accused was involved in criminal activity. Indeed, the Agent himself testified his purpose in detaining the accused was to insure the accused had authority to purchase such a

sensitive item. Accordingly, the initial stop of this accused was illegal and all evidence and/or subsequent statements made by this accused flowing from the illegal stop are inadmissible as "fruit of the poisonous tree."

/S/ R.C. McRorie
R.C. McRorie
Col., JAGC
Chief Circuit Judge
6th Judicial Circuit

COX, Judge (concurring):

In *United States v. Williams*, 29 MJ 112 (CMA 1989), and *United States v. Lee*, 25 MJ 457 (CMA 1988), we visited the customs and ration-control regulations in the Republic of Korea—USFK Regulation 27–5 and USFK Regulation 60–1. In *Lee*, I concluded that the so called "show and tell" regulations were lawful intrusions into a servicemember's constitutional rights. A majority of the Court of Military Appeals partially adopted this view in *Williams* by permitting at least a request that the items or required documentation be shown. *Id.* at 115. The facts of this case seem to me to be just a different twist to the underlying question of how far the authorities can go to enforce the customs and ration-control regulations abroad.

As I have indicated elsewhere, I am skeptical about rigidly applying civilian constitutional analysis to the military community. *See generally Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *United States v. Lee, supra* at 470; *United States v. Fagan*, 28 MJ 64 (CMA),

*cert. denied,* ——— U.S. ———, 110 S.Ct. 83, 107 L.Ed.2d 48 (1989). However, I certainly agree with the majority that, notwithstanding the legitimate purpose of furthering customs enforcement in the Republic of Korea, certain activities of the authorities can amount to an unwarranted infringement of constitutional rights of servicemembers.

As noted in the majority opinion, whether there has been a seizure depends on whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct.1975, 1979, 100 L.Ed.2d 565 (1988), *quoting United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *see also United States v. Fagan, supra* at 69. Necessarily, this involves a factual determination. If that be the case, and I agree that it is, then whether the military policeman "seized" the accused in a unconstitutional manner becomes a question of fact as well as one of law. *See Martinez v. Nygaard*, 831 F.2d 822, 826–28 (9th Cir.1987).

Here, Judge McRorie, a senior military officer and an experienced judge, determined as a matter of fact the accused was "seized" without probable cause or a "reasonably articulable suspicion." These findings of fact are supported by competent evidence of record and, therefore, should not be disturbed on appeal. *United States v. Burris*, 21 MJ 140, 144 (CMA 1985). Applying the law to these facts does not warrant reversal.