# UNITED STATES

v.

**Jorge L. RODRIGUEZ, 119–56–7223, Yeoman Third Class (E–4), U.S. Navy.**

**NMCM 95 00776.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 17 Feb. 1994.

Decided 27 Aug. 1996.

Maj David S. Jonas, USMC, Appellate Defense Counsel.

Louis P. Font, Civilian Defense Counsel.

LT Andrew J. Waghorn, JAGC, USNR, Appellate Government Counsel.

Before KEATING and CLARK, Senior Judges, and OLIVER, J.

OLIVER, Judge:

In this general court-martial tried in late 1993 and early 1994, officer and enlisted members convicted appellant, contrary to his pleas, of various offenses under the Uniform Code of Military Justice [UCMJ]. These offenses were: attempting to unlawfully transfer firearms in interstate commerce; conspiracy to unlawfully engage in the business of dealing in firearms without a license; desertion; failure to obey a lawful general

regulation; two specifications of unlawfully engaging in the business of dealing firearms without a license; unlawfully transferring 24 handguns; and unlawfully possessing 19 handguns from which the manufacturer's serial numbers had been obliterated, in violation of Articles 80, 81, 85, 92, and 134 of the UCMJ, 10 U.S.C. §§ 880, 881, 885, 892, and 934, respectively. The court sentenced him to confinement for 10 years, forfeiture of $200.00 pay per month for 60 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the adjudged sentence on 7 April 1995. Appellant asserts five errors on appeal.[1] Finding that none of these claimed errors prejudiced appellant's substantial rights, we affirm.

## FACTS

In the spring of 1991 Special Agent [SA] Grabman of the Bureau of Alcohol, Tobacco, and Firearms [ATF] received reports that appellant had purchased more than one firearm in a 5–day period at gun stores in Northern Virginia. Although there is no legal limit on the number of firearms one may purchase in Virginia, appellant's pattern of purchases caused SA Grabman to open an investigation. Further inquiry revealed that appellant had purchased some 24 inexpensive handguns, commonly called "Saturday Night Specials," during February and March of 1991, and that he had no license to sell firearms. ATF determined that appellant was on active duty in the Navy, and notified the Naval Investigative Service [NIS] to obtain their cooperation in the case.

Beginning on Monday, 29 April 1991, ATF and NIS worked together in a surveillance of appellant at his home in Northern Virginia and at his place of work, the Bureau of Naval Personnel in Arlington. The close surveillance revealed that appellant and YN1 Moore were making multiple purchases of handguns from local gun dealers. It appeared to the agents that Moore had made "straw purchases" for appellant so that appellant's name would not appear on the gun purchase applications. Over the next several days the agents observed appellant and Moore buy 19 such handguns.

Appellant's wife and children lived in New York City. He would often drive from Virginia to New York to visit them. On Friday, 3 May 1991, an informant advised the ATF and NIS that appellant planned to drive to New York City that weekend. The informant made no mention that appellant was going to transport any weapons. Later that afternoon the investigators followed appellant as he left work at 1530 and drove home. There he retrieved a large duffle bag which he transported back to the Navy Annex. Leaving the duffle bag there, he drove to Fort Myer where he picked up two passengers. Appellant then drove to an apartment where his daughter's aunt, Mrs. Barbara Soto, lived. He carried a rather heavy brown paper bag into the residence but left without the bag. Returning to the car with Mrs. Soto, the group of four drove north on I–95.

Although SA Grabman believed he had enough evidence of illegal activity to stop and arrest appellant at that time, he wanted to continue the investigation to try to identify the other members of what he believed to be an interstate weapons transportation network. ATF and NIS agents continued their surveillance of appellant's car in unmarked law-enforcement vehicles. Riding in an ATF vehicle was an NBC camera crew that ATF had contacted to film what the agents and crew believed would be a newsworthy event. Also present were some senior ATF officials and an ATF public affairs officer.

A Maryland State trooper stopped one of the unmarked ATF cars for speeding. After

---

1. I. THE MILITARY JUDGE ERRED IN FAILING TO GRANT THE DEFENSE MOTION TO SUPPRESS THE EVIDENCE.
II. APPELLANT'S RIGHTS UNDER ARTICLE 31(b) WERE VIOLATED BY MARYLAND STATE TROOPER PEARCE AND BY SA GRABMAN.
III. DEFENSE COUNSEL WERE INEFFECTIVE IN FAILING TO LITIGATE THE VOLUNTARINESS OF APPELLANT'S CONFESSION BEFORE THE COURT MEMBERS.
IV. THE MILITARY JUDGE ERRED IN FAILING TO SUBPOENA THE NBC CAMERA RECORDING OF THE STOP, SEARCH, AND INTERROGATION OF THE APPELLANT.
V. THE SENTENCE WAS INAPPROPRIATELY SEVERE.

advising the Maryland police authorities that they were surveilling a suspect as part of a Federal investigation, senior ATF personnel decided to enlist their cooperation in pulling appellant over. After seeing appellant's car pass his position, Trooper Pearce followed him for about a minute, noticed him tailgating a car in the fast lane, and pulled him over to the central median for "following too closely," a common traffic infraction. After examining appellant's license and registration and running a computer check, Trooper Pearce issued appellant a warning citation at 1946. He then requested that appellant consent to a "routine search" of his car for contraband. Appellant did so consent, in writing, at 1950. Over the next 1–1/2 hours or so, Trooper Pearce, assisted by ten or so ATF agents, conducted a thorough search of appellant's car in the expectation of finding one or more handguns.

Shortly after the search commenced, SA Grabman took appellant aside and, using a card he carried in his wallet, advised him of his *Miranda* rights. After appellant acknowledged his rights, SA Grabman questioned him about his purchases of handguns over the preceding few months. Appellant initially denied any wrongdoing. SA Grabman then reviewed the details of his case file with appellant and the extent of the Government's recent surveillance activities. After hearing these specifics, appellant stated, "You got me." SA Grabman then sought out two other agents to witness appellant signing a form acknowledging his *Miranda* rights at 2021 and several incriminating admissions which followed. SA Grabman then took appellant into custody. Finding no contraband in the car, the Federal agents permitted the other members of appellant's party to continue on their way to New York.

At about 2140, after sharing in cake and juice with appellant at a Maryland State police barracks, SA Grabman and SA Spigener of the NIS sat down to interview appellant and try to obtain further information. They advised appellant of his rights under Article 31, UCMJ, and *Miranda–Tempia*. Appel-

lant acknowledged his understanding of those rights in writing and executed a written statement which contained incriminating admissions. He also consented to various searches which uncovered handguns at several locations. Appellant admitted to having ground off the serial numbers from most of these guns.

After arraignment at appellant's first trial in 1992, during which several motions were litigated, appellant absented himself without authority for the stated purpose of earning money with which to hire a civilian defense counsel.[2] At his subsequent trial in late 1993 and early 1994, appellant was represented by two Army judge advocates as individual military counsel in addition to his detailed defense counsel. We turn now to a legal analysis of appellant's assignment of errors.

## DENIAL OF MOTION TO SUPPRESS

■ Appellant made a timely motion at trial to suppress his oral and written statements and the other evidence against him acquired as a result of the traffic stop, subsequent questioning, and arrest. In his first assignment of error he alleges violations of the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution. The gravamen of appellant's claim is that the warrantless stop of his automobile was an unreasonable seizure under the Fourth Amendment and that anything which flowed from it should not have been admissible against him.

■ The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Temporary detention of individuals during the stop of a car by the police, even if only briefly and for a limited purpose, constitutes a "seizure" within the meaning of this Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979); *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). Courts must review a police stop of a private car

**2.** This period of unauthorized absence, extending from 19 March 1992 through 24 August 1993, was the basis for Charge III, a violation of Article

85, for which the members found appellant guilty.

under the constitutional imperative that it not be "unreasonable." As a general matter, the decision to stop a car is reasonable where the police have probable cause to believe that the driver has committed a traffic violation. *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977)(per curiam).

Trooper Pearce clearly had probable cause to believe appellant had violated the traffic law. He testified that he observed appellant, over the course of several tenths of a mile, violating the applicable Maryland statute by following too closely.[3] Record at 55, 71–72. While appellant's brief argues that the police "manufactured" the traffic infraction (apparently based on some of Mrs. Soto's testimony),[4] appellant admits that he drove up on the tail of a car going relatively slowly in the fast lane, flashed his lights, and followed closely behind him for some distance. Record at 154. Despite the zeal with which appellate defense counsel made the argument that the circumstances of this traffic stop were "outrageous" and compared it to planting drugs in a suspect's car before arresting him (Appellate Brief at 14), the military judge rightly concluded that this was one of many routine traffic stops Trooper Pearce makes every day after he observes a traffic violation.

Appellant's stronger argument is that while Trooper Pearce may have had probable cause to stop him for the traffic violation, it was merely a pretext for the real reason; to enable ATF agents to search the car and interrogate him. Indeed, the officer admitted that his "primary purpose" in stopping appellant's car was to allow ATF agents to search it for guns. Record at 68. Appellant argues that this pretextual stop was an unreasonable infringement of his constitutional rights. Both at the trial and in the appellate

briefs before us, counsel have wrestled with whether stopping appellant in this manner was pretextual and, if so, whether such a stop was constitutional. After reviewing the arguments and conducting his own research, the military judge observed: "The Supreme Court has not ruled fully on the parameters of this traffic stop doctrine. The issue [of the pretextual stop] has presented a lively discussion in cases decided in various Circuit Courts of Appeal." Appellate Exhibit XXI.

In a case decided on 10 June 1996, the Supreme Court resolved any ambiguity concerning the test for pretextual traffic stops. In a unanimous decision, the Court held that the temporary detention of a motorist based on probable cause to believe he has violated a traffic law does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective. *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *Whren* involved two persons whom vice squad officers suspected were engaged in drug trafficking in a "high drug area" of the District of Columbia. The officers observed the two men remain for an excessive time at a stop sign, turn suddenly without signalling, and drive off at an "unreasonable" speed. After stopping the truck based on several violations of the traffic code, the officer observed two plastic bags of what appeared to be crack cocaine in Whren's hands. Justice Scalia quoted with approval the holding of the lower court: "[R]egardless of whether a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have*

---

**3.** This officer, whom the military judge found to be "one of the most credible police officers I have ever seen testify" and who had "no dog in this fight," Record at 253, certainly had probable cause to stop appellant for the traffic violation.

**4.** Although Mrs. Soto testified that "the car started slowing up in front of us," Record at 139, appellant never so testified. Mrs. Soto's testimony is hardly credible. She has appellant driving 70–75 miles per hour and slowing to 50 a moment later (based on her response to a leading

question that she happened to look at the speedometer), as he sought to avoid getting too close. Record at 139. Moreover, Mrs. Soto admitted on cross-examination that appellant had committed a traffic violation. She said after they had both grown "impatient" with the relative slowness of the car ahead, appellant followed "close behind for quite some time and he kept blinking his lights for the car to move and he wouldn't move." Record at 147.

stopped the car for the suspected traffic violation." *Whren,* —— U.S. at ——, 116 S.Ct. at 1772 (*quoting United States v. Whren,* 53 F.3d 371, 375 (U.S.App.D.C.1995)).

We conclude, therefore, that this stop, even if pretextual, was constitutionally sound because there was probable cause to stop appellant's car based on the traffic infraction which Trooper Pearce observed.

■ However, this conclusion does not end our inquiry. We must also examine whether the subsequent delay in getting appellant on his way was reasonable under the circumstances. *See United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Unlike in *Whren,* in which the officers immediately confirmed their suspicions of criminal drug activity by spotting the bags of cocaine in the car, the duration of the stop in this case was hardly temporary.

■ During a routine traffic stop, an officer may take the time necessary to review the driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993). "If the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue without delay for further questioning." *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). "If the officer wishes to detain the driver for further questioning unrelated to the initial stop, the officer must have an objectively reasonable articulable suspicion that illegality has occurred or is occurring." *Soto,* 988 F.2d at 1554.

■ The delay in this case was mostly due to appellant's consent to a search, consent he was under no obligation to give but of which the authorities took full advantage. If a person voluntarily consents to a search of his property, no probable cause or warrant is required. *United States v. Avery,* 40 M.J. 325, 328–29 (C.M.A.1994); Mil.R.Evid. 314(e). Once Trooper Pearce stopped appellant's car, he was justified in asking for his consent to search for contraband, including firearms. ATF agents had informed Trooper Pearce

that they had been surveilling appellant, whom they suspected of running handguns to New York, and that they believed weapons might be found in the car. Trooper Pearce had adequate reason to believe that appellant had weapons in the car, sufficient to support a limited search of the passenger and glove compartment. The military judge also found the scope and duration of the search to be reasonable and that appellant never attempted to withdraw his consent. Record at 254; Appellate Exhibit XXI (*citing United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

■ Appellant argues that he was deceived into consenting because Trooper Pearce said it would be "random" and "routine," and, by implication, only a few minutes in duration. Appellant states that the Government's intimidating and massive show of force coerced him into not withdrawing his consent and, later during the search, confessing to certain of the offenses of which he was convicted.

■ Although no evidence was found during the search, if the consent was indeed involuntary, appellant's subsequent admissions would be tainted. *See* Mil.R.Evid. 311; *United States v. Goudy,* 32 M.J. 88, 89–90 (C.M.A.1991). For evidence to be admissible following a consent search, the consent must be voluntary based on "clear and convincing evidence," Mil.R.Evid. 314(e)(5), based on the "totality of all of the surrounding circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). *See United States v. Frazier,* 34 M.J. 135, 137 (C.M.A.1992); *United States v. Burns,* 33 M.J. 316, 320 (C.M.A.1991). The Government has the burden of proving that the consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. White,* 27 M.J. 264, 265–66 (C.M.A.1988). *See* Mil.R.Evid. 314(e)(4).

Looking at the circumstances in this case, we conclude, as did the military judge, that appellant's consent to the search was voluntary. Appellant was a mature, intelligent, and savvy petty officer. He was motivated

and qualified to seek a commission in the Navy. Although subject to a traffic stop, appellant did not seem cowed by any coercion or intimidation. Although he said the authorities threatened that he would never see his daughters again, they testified there were no such threats. At the time he gave the consent, he was cooperative, unconcerned, sober, and calm. *See United States v. Murphy*, 36 M.J. 732, 734–35 (A.F.C.M.R. 1992), aff'd, 39 M.J. 486 (C.M.A.), *petition denied*, —— U.S. ——, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994). While the duration of the search was considerably longer than appellant anticipated, he never attempted to withdraw his consent. Moreover, appellant made incriminating statements, which gave SA Grabman probable cause to arrest him, within 35 minutes of his stop and consent to the search. The record strongly supports the military judge's conclusion that his consent was voluntary.

Appellant's reliance on *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994), for the proposition that appellant's consent was tainted by the illegal stop, is misplaced. In *McSwain*, the Circuit Court found that the initial detention of the car, beyond the minimal time necessary to determine that the temporary registration sticker was valid, was illegal. As a result, the officer's subsequent inquiries and request to search the car were tainted. *Id.* at 562–64. In the present case, Trooper Pearce requested consent while he was going through the procedures incident to the legal stop for the traffic violation. Record at 58–60. Moreover, he advised appellant, in writing, that he had a right to refuse. Appellate Exhibit XI ("Furthermore, I understand that I have a Constitutional right to refuse to consent to this search....") In *United States v. Fernandez*, 18 F.3d 874 (10th Cir.1994), the Circuit Court stated that while informing a suspect of "his right to refuse consent is not a prerequisite to establishing voluntary consent, we consider it a factor particularly worth noting." *Id.* at 882.

Since appellant's consent was freely given to Trooper Pearce in a non-confrontational setting and the consent form established that he could seek assistance from other officers in conducting the search, the delay in getting appellant back on the road was reasonable. Also reasonable was that ATF agents were lawfully on the scene searching appellant's car when SA Grabman obtained appellant's waiver of his rights and began interrogating him.

■ There is another, independent basis on which the detention of appellant and his car and the ensuing search and interrogation were appropriate. The military judge found that the ATF agents would have been justified in stopping and searching appellant's car even without the traffic stop based on "reasonable suspicion." Record at 253–54; Appellate Exhibit XXI. *See United States v. Sokolow*, 490 U.S. 1, 10–11, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989). During a *Terry*-type stop, *Sokolow* requires a finding that the authorities had "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Id.* at 7, 109 S.Ct. at 1585. In this case, the military judge found that the ATF and Trooper Pearce had a reasonable suspicion, based on the surveillance to date, the evidence of gun purchases, and an informant's tip concerning the trip to New York, confirmed by observation, that appellant would have one or more handguns in his car. *See United States v. Hawkins*, 811 F.2d 210, 213–14 (3d Cir.1987), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987). In *Alabama v. White*, 496 U.S. 325, 330–31, 110 S.Ct. 2412, 2416–17, 110 L.Ed.2d 301 (1990), the Supreme Court discussed "reasonable suspicion" for forcibly stopping a car based on an anonymous tip that it contained contraband.[5] In this case, the record provides ample support for the military judge's finding that the ATF agents

---

5. *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)(in determining whether police have sufficient cause to stop a car, "the totality of the circumstances—the whole picture—must be taken into account." *Id.* at 417, 101 S.Ct. at 695.) *Compare United States v. Bair*, 32 M.J. 404, 410–11 (C.M.A.), *cert. de-*

*nied*, 502 U.S. 967, 112 S.Ct. 438, 116 L.Ed.2d 457 (1991)(military judge found reasonable suspicion), *with United States v. Phillips*, 30 M.J. 1, 7 (C.M.A.1990)(investigator conceded in his sworn testimony that he had "no reasonable suspicion for seizing Phillips.")

had reasonable suspicion to stop appellant's car, search it for weapons, and question him concerning his recent suspicious activities.

We conclude, from our *de novo* review of the evidence, that the warrantless stop of appellant's automobile was not an unreasonable seizure under the Fourth Amendment and that all the evidence the Government obtained as a result of that stop was admissible against him.

## VIOLATION OF ARTICLE 31(b) RIGHTS

■ Appellant next asserts that because Trooper Pearce and SA Grabman failed to warn him of his rights under Article 31(b), UCMJ, that the military judge should have kept his incriminating statements from coming into evidence at his court-martial. Article 31(b),(d), UCMJ. *See* Mil.R.Evid. 305(c), 305(d)(1).

■ During testimony on the motion to suppress, appellant claimed that no one ever advised him of any of his rights until 2140, well after he had made several incriminating statements. Record at 171, 176–77. This was inconsistent with the sworn testimony of SA Grabman and several other agents, as well as documentary evidence, that appellant was given his *Miranda* warnings. Other than to tell him that he did not have to consent to the search, Trooper Pearce had no obligation to advise appellant of his *Miranda* rights. A request to search is not an interrogation, and, if the suspect is not in custody, the officer requesting it need not warn the person of his right to remain silent or his right to counsel. *Frazier*, 34 M.J. at 137; *United States v. Roa*, 24 M.J. 297, 299–301 (C.M.A.1987).

Appellant was not in custody at the point he gave consent. The Supreme Court has stated: "[T]he usual traffic stop is more analogous to a so-called *'Terry* stop,' *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). When this is the nature of the stop, a police officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.*

The temporary detention involved in this case was noncustodial and the initial questioning and request for consent were appropriate.

Moreover, although SA Grabman did not take appellant into custody immediately, he did advise him of his *Miranda* rights at the outset of his questioning. Indeed, the military judge found that appellant was advised of his *Miranda* rights twice, once before he asked him any questions and once more in writing at 2020 (which he acknowledged by signing the right's waiver form at 2021). Later in the presence of both SA Grabman and Agent Spigener of the NIS, appellant was advised of his Article 31 and *Miranda–Tempia* rights, which he signed and dated at 2140. Appellate Exhibit XIV.

■ The next question is whether Trooper Pearce or SA Grabman had an obligation to advise appellant of his rights under Article 31, UCMJ. The plain language of Article 31 seems to require warnings during any criminal interrogation only by a person "subject to [the UCMJ]." 10 U.S.C. § 831. Neither Trooper Pearce nor SA Grabman was subject to the Code, and thus the Code would not normally have required either of them to advise him of his rights under the UCMJ. Military Rule of Evidence 305(b)(1), however, provides that a "[p]erson subject to the code ... includes a person acting as a knowing agent." Moreover, the Court of Military Appeals (now the Court of Appeals of the Armed Forces) has required civilian law enforcement officials to inform a military member of his rights under Article 31 in at least two situations: (1) when the scope and character of the cooperative efforts between military and civilian investigators demonstrates that the two investigations have "merged into an indivisible entity"; and (2) when the civilian investigator acts "in any sense as an instrument of the military." *United States v. Lonetree*, 35 M.J. 396, 403 (C.M.A.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993), *quoting United States v. Penn*, 18 U.S.C.M.A. 194, 199, 39 C.M.R. 194, 199, 1969 WL 5949 (1969) (citations omitted).

Although appellant relies heavily on language in the *Lonetree* analysis, the Court in *Lonetree* in fact concluded that the civilian

investigators, although cooperating and coordinating closely with the NIS, were "not subject to the UCMJ" and were "conducting an independent investigation without serving as an instrument of the military...." Therefore, they "had no obligation to give Lonetree an Article 31 warning prior to their meetings with him." 35 M.J. at 396. The Court in *Penn* had reached the same conclusion: "[C]ivilian investigators, acting entirely independent of military authority, need not, as persons not subject to the [UCMJ], preliminarily advise an accused of his rights under Article 31." 18 U.S.C.M.A. at 198–99, 39 C.M.R. at 198–99, 1969 WL 5949 (merely because the Secret Service had asked for OSI's "assistance" in conducting the investigation did not require the Secret Service Agent to give Article 31 warnings. *Id.* at 201–02.). Similarly, the Court of Military Appeals concluded in *United States v. Moreno*, 36 M.J. 107 (C.M.A.1992), that a state social worker, whose primary purpose was to investigate child abuse, did not have to give Article 31 warnings as a condition for any resulting incriminating statements to come into evidence. *Id.* at 117. Finally, in *United States v. Raymond*, 38 M.J. 136 (C.M.A. 1993), after analyzing the history of Article 31, UCMJ, and Mil.R.Evid. 305(b)(1), the Court held that a social worker under contract to the Army was not acting as an investigative law enforcement agent. *Id.* at 139–40.

Compare these four cases, which held that there was no requirement to give Article 31 warnings, with the result in *United States v. Quillen*, 27 M.J. 312, 314 (C.M.A.1988). In *Quillen*, a base exchange detective stopped a service-member suspected of shoplifting, displayed her badge, and questioned him without giving an Article 31 warning. The Court explained that the detective's job was military in nature and that regulations required them to work closely with military police since shoplifting was a command concern. *Id.* at 314–15. The Court held that the detective's failure to provide Article 31 warnings to Quillen barred the introduction of his responses against him at court-martial. *Id.* at 315. At least two members of the Court have criticized the holding in *Quillen* as "overlook[ing] the history behind Article 31

... and the clear language of Mil.R.Evid. 305(b)(1)...." *United States v. Powell*, 40 M.J. 1, 4 (Crawford, J., concurring). *See Quillen*, 27 M.J. at 315–17 (Cox, J., dissenting).

In the present case, the ATF agents undertook an independent investigation of appellant based upon their own law enforcement charter. They notified NIS and coordinated the surveillance with them, but had never relinquished control of the investigation. And when SA Spigener, the NIS investigator, finally sat down with appellant to question him, he fully notified him of his rights under Article 31, UCMJ.

■ Moreover, even if Trooper Pearce and/or SA Grabman had an obligation to advise appellant of his rights under Article 31, UCMJ, any prejudice to appellant was purged by the subsequent *Miranda–Tempia*–Article 31 warnings, which he freely admits he received and which he signed prior to making his comprehensive, incriminating written statement. Appellant argues that the Government's illegal official conduct caused him to "let the cat out of the bag." *United States v. Alexander*, 18 M.J. 84, 87 (C.M.A.1984). But the key question is whether the subsequent incriminating confession is voluntary and based upon proper rights advisements. *See United States v. Murphy*, 39 M.J. 486, 488 (C.M.A.1994), *cert. denied*, — U.S. —, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994). In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court stated: "[T]he mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314, 105 S.Ct. at 1296. The Court rejected the Oregon state court's view that "the unwarned remark compromised the voluntariness of [Elstad's] later confession." *Id.* at 309, 105 S.Ct. at 1293. It also rejected the argument that the second confession should be suppressed under a "cat-out-of-the-bag" theory. *Id.* at 311, 105 S.Ct. at 1294. "This

Court has never held that the psychological impact of voluntary disclosure of a guilty secret ... compromises the voluntariness of a subsequent informed waiver." *Id.* at 312, 105 S.Ct. at 1294. *See United States v. Seay,* 1 M.J. 201, 204 (C.M.A.1975).

While we conclude on these facts that there was no governmental wrongdoing and therefore no primary taint, any taint which might have occurred was purged by the subsequent Article 31, UCMJ, advisement which SA Spigener provided appellant. The military judge "reduced [the fundamental facts to their] simplest terms" by concluding:

> [A]fter his vehicle was stopped for a traffic matter, [appellant] consented to a vehicle search and, while standing by during its execution, talked to an ATF agent; after being advised of his rights against self incrimination, he made an admission; after again being advised of his rights, he made further incriminating statements to the same ATF agent and then, after a third set of warnings, made written admissions to the ATF agent and to an NIS agent.

Appellate Exhibit XXI. We find nothing to indicate a violation of appellant's rights or other justification for the relief appellant has requested.

### INEFFECTIVE ASSISTANCE OF COUNSEL

■ Appellant next alleges that he was denied his right to effective assistance of counsel, claiming that his three trial defense counsel should have relitigated the voluntariness of his confession in front of the members. In evaluating adequacy-of-counsel claims, the Court of Appeals for the Armed Forces applies the standards the Supreme Court established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a strong presumption of effective assistance which appellant must overcome. *United States v. Ingham,* 42 M.J. 218, 223 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996). The standards involve a two-part determination:

> Not only must the defendant demonstrate that his attorney's "acts or omissions were outside the wide range of professionally competent assistance," [*Strickland v.*

*Washington,*] 466 U.S. at 690 [104 S.Ct. at 2066], ... but he also "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694 [104 S.Ct. at 2068].

*United States v. Griffith,* 27 M.J. 42, 43 (C.M.A.1988). *See United States v. Brothers,* 30 M.J. 289, 291 (C.M.A.1990). To prevail, the appellant must show that the errors were "so serious that counsel was not functioning as the 'counsel' guaranteed... by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Moreover, "[j]udicial scrutiny of counsel's performance must be highly deferential" and we must evaluate counsel's performance from counsel's perspective at the time. *Id.* at 689, 104 S.Ct. at 2065. Finally, as the Supreme Court emphasized in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the appellant must establish that the result of the proceeding was "fundamentally unfair or unreliable." *Id.* at 369, 113 S.Ct. at 842. *See Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)(the test is whether the trial was "rendered unfair and the verdict rendered suspect." *Id.* at 374, 106 S.Ct. at 2582.)

We have reviewed the record and appellate briefs and find that the zealous and capable representation appellant received from Captain Lang and Major Belser, the two Army defense attorneys he chose as his individual military counsel, as well as Lieutenant Burch, his detailed defense counsel, was well within the standards for professional competence. Trial defense counsels' decision not to relitigate the voluntariness of appellant's confession before members did not make their representation deficient. *See United States v. Loving,* 41 M.J. 213, 243–44 (1994), *aff'd,* — U.S. —, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). The defense counsel conducted vigorous cross-examinations of the Government witnesses to try to convince the members that the Government's show of force and other tactics intimidated appellant.

Moreover, we believe that even if the representation was deficient, there was no reasonable probability that, but for counsel's professional errors, the result of the proceed-

ing would have been different. To prevail, appellant would have had to convince the members that he was telling the truth and that several ATF agents, a Maryland State trooper, and an NIS agent, bolstered by two key pieces of contemporaneous documentary evidence, were all lying.

Finally, even if the members had discounted the confession and the derivative evidence, the prosecution proved its case through the testimony of the law enforcement agents, appellant's co-actor, and the physical evidence seized from independent sources. Appellant has not met the threshold burden to demonstrate that his trial lawyers' performance was ineffective under the applicable tests.[6] *Ingham,* 42 M.J. at 224.

We find this assignment of error likewise to be without merit.

### FAILURE TO SUBPOENA THE NBC CAMERA RECORDING

■ Appellant next alleges that the military judge erred by denying appellant's motion to enforce a Government subpoena of the "outtakes" of the video NBC had taken at the scene of the traffic stop. As a result, he claims violations of his constitutional rights under the Fifth and Sixth Amendments to the Constitution and under Article 46, UCMJ.

Well in advance of trial, the Government served two subpoenas on NBC legal counsel (on 21 February 1992 and 28 February 1992) requesting production of the video NBC had taken concerning appellant's traffic stop. R.C.M. 703(e)(2). In its response of 5 March 1992, Jane E. Genster, NBC's Washington counsel, informed the Government that NBC had honored the request for broadcast material, but would rely on its First Amendment news-gathering privilege in denying production of the "outtakes" of the videotape and reporter's notes. In support of this position, Ms. Genster's letter cited three cases: *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *United States v. Burke,* 700 F.2d 70 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983);

and *United States v. Hubbard,* 493 F.Supp. 202 (D.D.C.1979).

We have reviewed these and other applicable authorities, and have concluded that it is highly likely that NBC would have prevailed in its efforts to resist production. Disclosure of materials a news organization has prepared "may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical [to an issue at trial], and not obtainable from other available sources." *Burke,* 700 F.2d at 77, *quoting In re Petroleum Products Antitrust Litigation,* 680 F.2d 5, 7–8 (2d Cir.1982)(per curiam), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982).

Prior to trial appellant moved to enforce the Government subpoena of these tapes. Appellant claims that the tape would have been the best evidence of what transpired during the traffic stop, and it was unfair that the military judge based his findings of fact upon the word of law enforcement agents. In response to appellant's motion to compel discovery, the Government served a third subpoena on NBC, dated 25 January 1994. NBC again responded by asserting its First Amendment privilege. During the motion stage, the military judge declined to abate the proceedings to compel discovery, ruling that there was already adequate evidence before the court, and the outtakes would not be more enlightening than the segment already provided to the court. Record at 251; Appellate Exhibit XXII.

Each party to a court-martial is entitled to "equal opportunity to obtain witnesses and evidence" that is necessary and relevant to the case. Article 46, UCMJ, 10 U.S.C. § 846; R.C.M. 703(a), 703(f)(1). *See* R.C.M. 703(f)(4)(C). The Government may obtain by subpoena evidence which is not under its control. R.C.M. 703(f)(4)(B). Nonetheless, neither party is entitled to the production of evidence which is not subject to compulsory process. R.C.M. 703(f)(2). In the present case, the Government took all reasonable steps, including phone calls, letters, and subpoenas, to obtain these "outtakes." NBC

---

**6.** We therefore find it unnecessary to resort to an evidentiary hearing to resolve the claim of inef-

fective assistance of counsel. *See United States v. Lewis,* 42 M.J. 1, 3–4 (1995).

remained steadfast in its assertion of its First Amendment privilege and stood ready to litigate the matter. Moreover, at least absent a strong showing of materiality and necessity, there was a strong likelihood that NBC would have succeeded in quashing the subpoena. *See Burke,* 700 F.2d at 77–78.

Appellant alleges at trial and upon appeal that the outtakes were the best evidence concerning whether the Government committed any constitutional violations during the traffic stop. However, he has introduced no evidence in support of his position. He can only speculate that the videotape would have included information which supports his position.[7] There were several witnesses to the actual events who testified under oath. The Government was prepared to stipulate as to the testimony of at least one of appellant's other witnesses. Therefore, the military judge found that the evidence, even if it existed and was relevant to an issue in the case, was unnecessary and cumulative. Record at 250–51.

As a result, the military judge did not abuse his discretion in deciding not to abate appellant's general court-martial and require the Government to litigate the privilege issue with NBC. This assignment of error is also without merit.

## INAPPROPRIATELY SEVERE SENTENCE

█ Finally, appellant argues that his sentence, which included a bad-conduct discharge and 10 years confinement, was "grossly excessive,"[8] especially when compared with the much lighter sentence received by YNSR Moore. Although Moore had been appellant's supervisor and admitted to engaging in a criminal conspiracy with a military subordinate, he received a sentence of a bad-conduct discharge, forfeitures, reduction to E–1, and confinement for a period of only 3 years.

The Court of Military Appeals considered similar issues in the cases of *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982), and *United States v. Olinger,* 12 M.J. 458 (C.M.A. 1982). In *Olinger,* the Court held that while the appropriateness of an appellant's sentence is to be determined without reference to sentences in other cases, appellate courts may afford relief when there are highly disparate sentences in closely related cases. 12 M.J. at 460. It is clear from the record of trial that appellant was the primary actor in this illegal enterprise to buy and resell handguns, at considerable profit, on the criminal market. The members found that appellant, unlike his co-actor, had deserted the Navy in violation of Article 85, UCMJ. Moreover, Moore was rewarded for the fact that he pled guilty and cooperated in testifying against appellant. In exercising our broad fact-finding powers under Article 66, UCMJ, 10 U.S.C. § 866, we conclude that the sentence in this case was not inappropriately severe.[9]

## CONCLUSION

After considering the entire record, we are convinced that there was no prejudice to the substantial rights of the appellant. Accordingly, we affirm the findings and the sentence, as approved on review below.

Senior Judge KEATING and Senior Judge CLARK concur.

---

7. In its brief, and speculating that there was no such evidence, appellate government counsel "questions why any diligent news reporter would choose to air a short, uneventful segment of a traffic stop and leave on the cutting room floor a videotape of a coerced confession." Government Reply Brief at 20.

8. Appellate Defense Brief at 24. In *Ingham,* 42 M.J. at 229–30, the Court of Military Appeals concluded, after suggesting that in its experience the sentence of 40 years was "rather lengthy confinement," it was nonetheless "lawful." *Id.* at 229–30. The Army Court of Military Review had earlier found that sentence to be "appropri-

ate." *United States v. Ingham,* 36 M.J. 990, 997 (A.C.M.R.1993), aff'd, 42 M.J. 218 (1995).

9. When appropriate, this Court will reassess a sentence when the disparity between closely related cases reveals an injustice. *See United States v. Kelly,* 40 M.J. 558, 570, 575 (N.M.C.M.R.1994). "[O]ur discretion clearly should be exercised in cases in which the disparity in ... sentence results from a factor that seriously detracts from the appearance of fairness and integrity in military justice proceedings." *Id.* at 570.